## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA, THE STATE OF COLORADO, THE STATE OF FLORIDA, THE STATE OF NORTH CAROLINA, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF LOUISIANA, THE STATE OF TENNESSEE, THE STATE OF INDIANA, THE STATE OF TEXAS, THE STATE OF WASHINGTON, and THE COMMONWEALTH OF VIRGINIA, ex rel. RUSSELL MILLER | Civil Action No:<br><br>Hon.: |
| Plaintiffs, | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| v. | **DO NOT PLACE IN PRESS BOX** |
| CRH MEDICAL CORPORATION, CRH ANESTHESIA MANAGEMENT, LLC., TUSHAR RAMAI, M.D., RICHARD BEAR, and JAY KREGER | **DO NOT ENTER ON PACER**<br><br>**JURY TRIAL DEMANDED** |
| CRH ANESTHESIA of GEORGIA, LLC GASTROENTEROLOGY ANESTHESIA ASSOCIATES, LLC OCONEE RIVER ANESTHESIA ASSOCIATES, LLC LAKE LANIER ANESTHESIA ASSOCIATES, LLC SOUTH METRO ANESTHESIA ASSOCIATES, LLC, and JOHN DOES 1-50 (collectively "Georgia entities") | |
| CRH ANESTHESIA of COLORADO, LLC CENTRAL COLORADO ANESTHESIA ASSOCIATES, LLC, and JOHN DOES 1-50 (collectively "Colorado entities") | |
| METRO ORLANDO ANESTHESIA ASSOCIATES, LLC | |

FLORIDA PANHANDLE ANESTHESIA
ASSOCIATES, LLC
CRYSTAL RIVER ANESTHESIA
ASSOCIATES, LLC
ORANGE COUNTY ANESTHESIA
ASSOCIATES, LLC,
FDHS Anesthesia, LLC,
and JOHN DOES 1-50
(collectively "Florida entities")


ANESTHESIA CARE ASSOCIATES,
LLC,
and JOHN DOES 1-50
(collectively "Indiana entities")

SHREVEPORT SEDATION
ASSOCIATES, LLC and
JOHN DOES 1-50
(collectively "Louisiana entities")


COASTAL CAROLINA SEDATION
ASSOCIATES, LLC
TRIAD SEDATION ASSOCIATES , LLC,
and JOHN DOES 1-50
(collectively "North Carolina entities")


LAKE ERIE SEDATION ASSOCIATES,
LLC
WESTERN OHION SEDATION
ASSOCIATES, LLC
CRH ANESTHESIA of OHIO, LLC,
and JOHN DOES 1-50
(collectively "Ohio entities")

TENNESSEE VALLEY ANESTHESIA
ASSOCIATES, LLC
KNOXVILLE GASTROENTEROLOGY
ANESTHESIA ASSOCIATES, LLC
CRH ANESTHESIA of KNOXVILLE,
LLC,
and JOHN DOES 1-50
(collectively "Tennessee entities")

CENTRAL VIRGINIA ANESTHESIA
ASSOCIATES, LLC and JOHN DOES 1-50

PUGET SOUND
GASTROENTEROLOGY, PLLC
LAKE WASHINGTON ANESTHESIA,
PLLC, and JOHN DOES 1-50
(collectively "Washington entities")

TEXAS AND MASSACHUSETTS
ENTITIES, JOHN DOES 1-50

Defendants.

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT
## TRIAL BY JURY REQUESTED

**NOW INTO COURT**, through the undersigned counsel, comes Relator, Russell Miller, in the name of and on behalf of the United States of America, the State of Colorado, Florida, Georgia, Indiana, Louisiana, North Carolina, Ohio, Tennessee, Virginia, and Washington, who submit this Complaint for Damages as follows:

## INTRODUCTION

1. This action arises under 31 U.S.C. § 3729 *et seq*., also known as the False Claims Act ("FCA"), to recover treble damages and civil penalties on behalf of the United States of America and the States arising out of Defendants' knowing violations of the FCA and State FCA's and unjust enrichment, as well as the United States' payments to Defendants by mistake.

2. Specifically, Defendants knowingly presented or caused to be presented numerous false claims for payment or approval to the United States and the State of Georgia Medicaid program in violation of 31 U.S.C. § 3729(a)(1), Ga. Code Ann. § 49-4-168. l (a)(l), and other similar state FCAs. Defendants also knowingly made, used, or caused to be made or

used, false records or statements to get false claims paid or approved by the United States and the State of Georgia Medicaid Program in violation of 31 U.S.C. § 3729(a)(2) and Ga. Code Ann.  § 49-4-168. l (a)(2), and other similar state FCAs.

3.  This Complaint will describe the fraudulent practices Defendants have committed and participated in, individually and collectively, to defraud the federal and state governments. Specifically, this Complaint will describe a systematic scheme by which CRH Anesthesia Management, LLC (hereinafter referred to as "CRHA") forms sham joint ventures through which CRHA pays kickbacks to referring physicians in exchange for the referral of anesthesia services to CRHA.

4.  The referring physicians are commonly gastroenterology doctors ("GIs"), who perform surgeries at, and have ownership in, ambulatory surgical centers (hereinafter referred to as "ASCs").

5.  Prior to the joint venture being established, the referring physicians owned and controlled the anesthesia service providers and the provision of anesthesia services at their ASCs. CRHA formed the joint ventures to essentially buy the anesthesia referrals from the referring physicians.

6.  The scheme is simple but well disguised. CRHA forms companies nationwide to provide anesthesia services to ASCs. CRHA uses these newly established companies to form sham joint ventures wherein CRHA pays ASCs and referring physicians for exclusive referrals of anesthesia services. After CRHA establishes and forms an entity, CRHA purports to purchase an ownership interest in the newly established entity, commonly through a lump sum payment to the referring physicians. This newly created entity assumes all anesthesia services for the ASC.

7. The money in these transactions flows directly to the ASCs and their physician owners, who are the referring physicians. The joint venture replaces the existing physician owned anesthesia company then servicing the ASC and that was wholly owned by the ASC and its physicians, which in itself is also a violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b *et seq.* and FCA. Relator believes the joint venture purchase agreement guarantees exclusive referrals to CRHA and further by requiring reimbursement of the lump sum purchase payment if the referring physicians leave the practice before a designated time period.

## JURISDICTION AND VENUE

8. Under § 3732 of the FCA, this Court has exclusive jurisdiction over the actions brought under the FCA.  Furthermore, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

9. This Court has supplemental jurisdiction over all other claims set forth in this Complaint because these claims are so related to the claims arising under the federal False Claims Act that they form part of the same case or controversy.  28 U.S.C. § 1367.

10. Venue is proper in this district pursuant to § 3732(a) of the Act, which provides that any action under § 3730 may be brought in any judicial district in which the Defendant or in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred. Acts that are the subject of this action occurred in the State of Georgia, within this judicial district, as well as nationwide.  At all times material thereto, Defendants regularly conducted substantial business within the State of Georgia, maintained permanent employees in the State of Georgia, and made, and is making, significant sales and claims for reimbursement within

the State of Georgia within this judicial district.  Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## FILING UNDER SEAL

11. Under the FCA, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.

12. As required by the FCA, Relator voluntarily submitted prior to the filing of this Complaint a confidential written disclosure statement (subject to the attorney client and common interest privilege) to the United States Government and the plaintiff states, containing materials, evidence, and information in their possession pertaining to the allegations contained in this Complaint.

## THE PLAINTIFFS

13. The Plaintiff, the United States of America by and through its departments, the Department of Health and Human Services ("HHS"), particularly the Centers for Medicare and Medicaid Services ("CMS") within the HHS, is responsible for administering Federal and Health Care Programs including Medicare and Medicaid.

14. The Medicaid Program is a State and Federal Assistance Program to provide payment of medical expenses for low income and disabled beneficiaries.  Medicaid Program funding is shared by the Federal Government and those states participating in the program; apportionment of funding varies from state to state.  The primary purpose of the Medicaid Program is to enable each state, as far as practicable under the circumstances in such state, to furnish medical assistance on behalf of families with dependent children, the aged, blind, or disabled individuals, whose income and resources are insufficient to meet the cost of necessary medical services.  Medicaid covers approximately 47 million individuals

nationwide. States are required to provide certain basic medical services, such as in-patient hospital care to needy individuals.  States may also cover durable medical devices and other services under the Medicaid Program.  See 42 U.S.C. § 1396(d)(a)(12).

15. The Plaintiff, State of Georgia, by and through its Georgia Department of Community Health particularly the Georgia Medicaid Program, is responsible for administering the joint and federal-state health care program known as Medicaid in the State of Georgia.

16. Additionally, The Plaintiffs, States of Colorado, Florida, Georgia, Indiana, Louisiana, Massachusetts, North Carolina, Ohio, Tennessee, Virginia, and Washington are responsible for administering the joint and federal-state health care program known as Medicaid.

17. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Federal Medicare Program, which authorizes medical benefits for the aged, blind, and disabled.  Medicare is a health-financing program for the elderly.  Entitlement to Medicare is based on age, disability, or affliction with end-renal disease.  See 42 U.S.C. §§ 426, 426(a).

18. Title XIX of the Social Security Act was enacted by Congress to establish the Medicaid Program.  See 42 U.S.C. §§ 1396-1396(v).

19. Medicaid is funded by both federal and state money, with the federal contribution capsulated separately for each state.  See 42 U.S.C. §§ 1396(d) & 1396(D)(b).

20. Upon information and belief, the Defendants derive a substantial portion of their revenue from the federal and state funded programs including but not limited to: Medicare Programs, Medicaid Programs, Federal Employee Health Benefits, Department of

Veterans Affairs, Department of Defense, the Public Health Services and other federal, state, and city insurance plans.

**THE DEFENDANTS**

21. Defendant, CRH Medical Corporation (hereinafter referred to as "CRH"), founded in 2000, is a Canada based healthcare products and service company.  CRH provides products and services to United States gastroenterologists. CRH is headquartered in Vancouver, British Colombia, Canada but focuses its business on the United States. It has offices located in Bellevue, Washington. CRH owns the CRH O'Regan System, which provides gastroenterologists with the O'Regan Ligator device, training and treatment protocols for this device, and operational and marketing support. CRH is the owner and parent company of Defendant CRHA.

22. Defendant, CRH Anesthesia Management, LLC (hereinafter referred to as "CRHA") a subsidiary of CRH, is a Delaware limited liability company with National Registered Agents, Inc. located at 1209 Orange Street, Wilmington, Delaware 19801 as its registered agent for service of process.

23. CRHA was formed in December of 2014 to provide GI anesthesia clinical services including staffing, program implementation, and management of daily operations for endoscopy surgery centers.

24. CRHA's website contains statements from Defendants, Dr. Tushar Ramani and Jay Kreger, describing CRHA as a full-service management company. "Lastly, CRH also offers full anesthesia management services where an existing ambulatory surgical center seeks quality

anesthesia partner skilled in staffing, revenue cycle management, and the daily operations of an outpatient setting."[1]

25. CRHA enters into sham joint ventures ("JV") with ASCs around the country, including those located in this district, in order to lock in anesthesia referrals through exclusive anesthesia contracts between the JV and the ASC. It shares the revenue from those referrals with the physician referrer owners of the ASCs.

26. CRH states "[i]t is well known today that many gastroenterologists have implemented anesthesia programs; we have found that they can all benefit both clinically and financially from a full or partial association with CRH."[2] In its most recent 10-K, CRH represents that its "joint venture model allows the physician group to participate in the management of the anesthesia service, but also to realize value in a portion of their anesthesia business while retaining an ongoing revenue stream and reducing risk from an operational, regulatory, and reimbursement standpoint. The acquired anesthesia group provides anesthesia services to the partner ASC under a professional services agreement."[3]

27. CRHA began forming sham JVs with the acquisition of Gastroenterology Anesthesia Associates located in Atlanta, Georgia and has expanded to approximately sixty-six (66) ASCs in thirteen (13) states.

28. CRHA facilities provide a minimum of 378,000 procedures annually.

29. CRH's ambulatory service centers include but are not limited to CRH Anesthesia of Colorado, LLC (Colorado), Central Colorado Anesthesia Associates, LLC (Colorado), Metro Orlando Anesthesia Associates, LLC (Florida), Florida Panhandle Anesthesia

---

[1] www.crhanesthesia.com.
[2] www.crhanesthesia.com.
[3] CRH Medical Corporation, Form 10-K, March 11, 2020, available at https://investors.crhsystem.com/wp-content/uploads/CRHM-10K-Master-Master_Exhibits_Word.pdf (last visited December 14, 2020.)

Associates, LLC (Florida), Crystal River Anesthesia Associates, LLC (Florida), Orange County Anesthesia Associates, LLC (Florida), FDHS Anesthesia, LLC (Florida), CRH Anesthesia of Georgia, LLC (Georgia), Gastroenterology Anesthesia Associates, LLC (Georgia), Oconee River Anesthesia Associates, LLC (Georgia), Lake Lanier Anesthesia Associates, LLC (Georgia), South Metro Anesthesia Associates, LLC (Georgia), Anesthesia Care Associates, LLC (Indiana), Shreveport Sedation Associates, LLC (Louisiana), Coastal Carolina Sedation Associates, LLC (North Carolina), Triad Sedation Associates, LLC (North Carolina), Lake Erie Sedation Associates, LLC (Ohio), Western Ohio Sedation Associates, LLC (Ohio), CRH Anesthesia of Ohio, LLC (Ohio), Tennessee Valley Anesthesia Associates, LLC (Tennessee), Knoxville Gastroenterology Anesthesia Associates, LLC (Tennessee), CRH Anesthesia of Knoxville. LLC (Tennessee), Central Virginia Anesthesia Associates, LLC (Virginia), Puget Sound Gastroenterology, PLLC (Washington), and Lake Washington Anesthesia, PLLC (Washington).

30. Relator believes that CRH has entered into materially identical relationships with other entities besides those listed by name here, which are referred in this disclosure and will be referred in the complaint as John Does 1-50.

31. Defendant, Dr. Tushar Ramani, is the CEO of CRH. He has over thirty (30) years' experience in the anesthesia industry.  Initially, Dr. Ramani worked as an anesthesiologist and pain management specialist. He then focused his career on the management side of medicine in nationally prominent healthcare service companies as co-founder of Anesthetix and CEO of MedOptions, Inc. Both of these companies offered management services in the healthcare industry.

32. Defendant, Richard Bear, has been the CFO of CRH since 2006. He has experience in financial transactions and acquisition financing as the former CFO of ID Biomedical Corporation.

33. Defendant, Jay Kreger, president of CRH since 2016, also has over twenty-five (25) years' experience in business development and operations in the healthcare industry. Most notably, as the former vice president of HCA's Ambulatory Surgery Division, he expanded HCA's network of surgery centers through acquisitions.

<u>**THE RELATOR**</u>

34. Relator, Russell Miller, is a resident of the state of Colorado and is the original source of the facts and information alleged herein.

35. The facts averred herein are based upon information inquired by Relator's interaction with Defendants' employees of the previous and current anesthesia companies described in this action, AAR and CCAA.

36. Relator has worked as a healthcare provider for twenty-five (25) years.

37. Initially, Relator was a medic in the Army National Guard. Relator graduated Nursing school in 1998, worked as an RN in the ICU and ER, and then was employed as a flight nurse at Flight for Life Colorado in Denver, Colorado from 2005-2010. Thereafter, he received his Master of Science in Nurse Anesthesia from Westminster College, Salt Lake City, Utah in December 2012.

38. Relator has practiced as a certified registered nurse anesthetist (hereinafter referred to as "CRNA") for approximately 8 (eight) years. In 2013, Relator began practicing as a CRNA at Peak Anesthesia in Denver, Colorado. He formed Summit Comfort Anesthesia (hereinafter referred to as "Summit"), an anesthesia company which provides hourly

employment for CRNA's. Relator works at different healthcare facilities through his own company. Relator also works one week per month as a 1099 hourly contractor at Citizens Medical Center in Colby, Kansas.

## LEGAL BACKGROUND

### The Federal False Claim Act ("FCA")

39. Pursuant to the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A), a cause of action arises when any person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

40. Liability also arises under 31 U.S.C. § 3729(a)(1)(B) when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

41. As defined under 31 U.S.C. § 3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is necessary. *Id.*

42. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than five thousand and five hundred dollars ($5,500) and up to eleven thousand dollars ($11,000) for each such claim, and three times the amount of the damages sustained by the government.[4] The FCA empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to be awarded between fifteen (15) to thirty (30) percent of the amount recovered.

---

[4] The actual per claim damages have since been increased.

43. If a person other than the Attorney General brings suit, the complaint must remain under seal and defendants must not be served until the later of ninety (90) days after the service of the complaint or any extension of the ninety (90) days that is requested by the Attorney General and granted by the court.

## CASE BACKGROUND

### The Specialty Physician/Gastroenterologist/Surgeon

44. This case involves gastroenterologists who control referrals of anesthesia.   The gastroenterologists (hereinafter referred to as "GI") are the treating physician of the patient, the surgeons that conduct the surgery, and the surgeons that own the ASC in which the patient receives the surgery.   The specialty physicians at issue here are primarily gastroenterologists or "GI" doctors, who focus on the digestive system and conduct surgical procedures particular to that specialty, such as colonoscopies, endoscopies, and sigmoidoscopies.

### The Practice of Anesthesiology

45. Anesthesiology is a practice of medicine dedicated to the relief of pain and total care of the patient before, during and after their surgery.   Anesthesiologists ("MDAs") are medical doctors who serve a central role in the operating room and make decisions to protect and regulate critical life functions. Certified Registered Nurse Anesthetists (CRNAs) are advanced practice nurses who also administer every type of anesthetic, work in every type of practice setting, and provide care for every type of operation or procedure. In some states, CRNA's work under the supervision of a medical doctor and in other states, CRNAs are allowed to practice independently.

46. Unlike GI doctors, MDAs and CRNAs do not have ongoing relationships with patients and only see patients as part of a surgical procedure.  Thus, their practice depends on referrals by other doctors, in this case, GI doctors.

**Endoscopic Procedures**

47. "Every year there are over 75 million endoscopic procedures in the US that allow healthcare providers to perform hundreds of essential procedures, ranging from colonoscopies to treatment of pancreatic cancer."[5] "Over 19 million colonoscopies are performed annually, as reported in 2017, a significant contribution to the 75 million endoscopies performed each year in the United States. A major factor driving growth in colonoscopy procedures is the increasing public awareness of colon cancer, through media campaigns initiated by cancer awareness groups and government bodies, as well as an aging population that is recommended to receive regular screenings."[6]

**The Advent of ASCs**

48. The anesthesia services at issue in this case are performed in ASCs owned and controlled by the GI doctors.  An understanding of how GI doctors came to control the ASCs and provision of anesthesia services is important.  Historically, the surgical procedures at issue here were performed in hospitals, rather than private offices, because the use of anesthesia required the safeguards of a hospital setting equipped to handle emergencies or surgical complications.  Over the last thirty years, however, surgical techniques and technology improvements made it viable to increasingly conduct these surgeries in outpatient facilities.

---

[5] Food and Drug Administration, "Quality Control Stopping Infections Before They Happen through Safer Endoscopic Re-processing" (January 9, 2020).
[6] iData Research, *An Astounding 19 Million Colonoscopies are Performed Annually in the United States*, August 8, 2018, available at https://idataresearch.com/an-astounding-19-million-colonoscopies-are-performed-annually-in-the-united-states/ (last visited December 15, 2020.)

In 1970, these developments led to the birth of the Ambulatory Surgical Center (ASC) concept.

49. Today, nearly two-thirds of all surgeries are performed in ASCs, according to the Centers for Disease Control and Prevention.[7]

50. There are estimated to be over five thousand ASCs across the United States based on data from CMS 2020.The ASC market is estimated to expand up to $52-$55 billion by 2025. "In 2017, 5,603 Medicare-certified ASCs treated over 3.4 million Medicare fee-for-service (FFS) beneficiaries."[8]

51. ASC facility services, for which payment is packaged in the ASC payment for a covered surgical procedure include, but are not limited to nursing, technician, and related services; use of the facility where the surgical procedures are performed; administrative, recordkeeping, and housekeeping items and services; materials, including supplies and equipment for the administration and monitoring of anesthesia; and supervision of the services of an anesthetist by the operating surgeon or other MD when required by state law.

52. Anesthesia services are not included in the ASC facility payments and may be separately billable under other provisions of Medicare Part B.

**The Problem and the Response: Self-Referral and Anti-Kickback Laws**

53. The moment that the specialists (here, GIs) stood to financially profit from ownership in ASCs, physician ownership of ASCs exploded, particularly in specialties that perform surgical procedures, such as gastroenterology, which now accounts for nearly two-thirds

---

[7] The Ambulatory Surgery Center Association defines ASCs as health care facilities that focus on providing same-day surgical care, including diagnostic and preventive procedures which are an alternative to hospital-based outpatient procedures.
[8]  Business Wire, United States Ambulatory Surgery Center (ASC) Market Set to Reach $52-55 Billion by 2025 - ResearchAndMarkets.com, October 29, 2019.

of all procedures performed in ASCs in the United States.  Indeed, by 2010, ninety (90) percent of ASCs were owned by physician/surgeons who self-refer.

54. Recognizing the inherent conflict of interest that was created (a driver of inappropriate use of services/self-referrals in ASCs), Congress sought to undo the problem in two ways. First, it passed a series of laws beginning in 1989 with the "Stark Law" to regulate self-referrals. *See* 42 U.S.C. § 1395nn. Second, it passed the Patient Protection and Affordable Care Act ("PPACA"), H.R. 3590, Section 6001, Pub. Law No. 111-148, 111 Congress 2010, which curtailed growth in physician ownership of surgical facilities by prohibiting both the creation of new and the expansion of existing physician-owned outpatient facilities.

55. The fraud in this case does not involve Stark per se because anesthesia is not a Designated Health Service within the scope of Stark, but it does involve a related statute – the Anti-Kickback Statute - which incorporates numerous Stark provisions, and which also prohibits referrals which are induced through the payment of a financial incentive.

**Anti-Kickback Statute**

56. In 1972, Congress enacted the federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b *et seq*., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government. AKS also provides that those who knowingly and willfully solicit or receive, offer or pay anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony. 42 U.S.C. § 1320a-7b(b)(1).

57. To be a kickback, the value that is conveyed to a referrer does not need to be an outright payment to the referrer. There are many artifices by which value can be conveyed; to wit, forgiving an obligation conveys value, charging less than fair market value conveys value, providing services of anything in kind without a commensurate payment conveys value. Regardless of how value is conveyed, it is a kickback if one purpose is to induce referrals for services covered by Medicare or Medicaid. *See, e.g., United States v. Greber,* 760 F.2d 68, 69 (3rd Cir. 1985), *cert. denied*, 474 U.S. 988 (1985) (holding that under the "one purpose" test "if one purpose of the payment was to induce referrals, the medicare [sic] statute has been violated."

58. The purpose of the AKS is to protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than the cost, quality of care, or necessity of health services. Violations of AKS form a basis for False Claims Act ("FCA") liability. See 42 U.S.C. § 1320(a)-7b(g). Additionally, violations of the AKS are a per se false claim under the FCA.[9] Thus, complying with AKS is essential to protecting Medicare and Medicaid and is material to payment and participation in government-funded health care programs.

**Fraud Modality One: Sham Joint Ventures and the OIG Guidance**

59. The payment of kickbacks for referrals is unlawful, as further explained below. As such, to cover up the kickbacks, CRHA creates sham joint ventures with its referral sources so

---

[9] *United States ex rel. Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017); *see also United States ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1326–27 (M.D. Fla. 2017) ("But a False Claims Act claim predicated on a violation of the amended Anti-Kickback Statute need not allege materiality because a violation of the Anti-Kickback Statute presumptively establishes a False Claims Act violation. 42 U.S.C. § 1320(a)-7(b)(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false *1327 or fraudulent claim for purposes of [the False Claims Act].")

as to have a conduit for the payment of the kickbacks to those referral sources, as explained in more detail below.

60. CRHA's fraudulent scheme is remarkably simple. CRHA approaches physicians (and/or their group) who control anesthesia referrals and who already own both ASCs and anesthesia companies that service their ASCs. CRHA convinces these physicians to enter into a joint venture for anesthesia services with CRHA that allows CRHA to provide all anesthesia services to the ASC.[10]

61. To affect the transaction and to help disguise the true nature of the kickback payment, CRHA establishes entities prior to the transaction. After establishing the entity, the CRHA-created entity begins to provide all of the anesthesia services for the ASC. In effect, the newly established entity simply replaces the then existing ASC and physician-owned anesthesia company. Yet, all of the anesthesia company employees remain the same and operationally, nothing changes after the CRHA established entity takes over. In fact, it would be difficult to even know there was a change in the entity providing anesthesia services as the ASCs.

62. After forming a company (commonly, an LLC) CRHA pays the ASC physicians a lump sum payment for a majority ownership of the newly established anesthesia company that it itself recently formed. After a couple of years (depending on the terms of each transaction), CRHA then pays the ASC physicians an additional, second lump sum payment for the remaining interest in the anesthesia practice. The joint ventures were and are nothing more than a method for CRHA to lock up referrals and pay a kickback for such

---

[10] Exhibit 1

referrals, the very thing the OIG warned against in 2003 and 2012 as described immediately below.

63. In sum, in each instance and as further detailed below with respect to each specific joint venture, CRHA provided  the  anesthesia services for a kickback to the respective ASC partner. The kickback granted CHRA exclusive patient referrals from the ASC and its physician-owners. The arrangement specifically provides that the ASC partner has to pay the lump sum back to CRHA if he/she leaves the practice before a designated period of time. This arrangement potentially jeopardizes patient safety since the surgeons are effectively bound to the anesthesia company. If the surgeons think the anesthesia company is performing poorly, they have a significant financial incentive to maintain the status quo and potentially tolerate sub-standard service.

**OIG 2003 Opinion**

64. The type of operation run by CRHA was the subject of guidance by the OIG, who expressed concern about joint ventures when one entity is in a position to refer business to another that furnishes services for which a Federal health care program pays.  *See* Special Advisory Bulletin, "Contractual Joint Ventures," 68 FR 23148 (Apr. 30, 2003).

65. In that Special Advisory Bulletin, the OIG detailed questionable arrangements where a health care provider in one line of business, such as an ASC (referenced as "owner" in the Bulletin), expands into a related health care business by contracting with an existing provider of a related item or service, such as CRHA (referenced as "supplier" in the Bulletin), to provide the new item or service to the ASC's existing patient population, including Federal health care program patients.  The OIG pointed out that those sham ventures often involve the supplier— here, the anesthesia company— not only managing

the new line of business, but also supplying it with inventory, employees, billing, and other services. Exclusivity is often a requirement of the joint venture.

66. Basically, the joint venture in these sham arrangements consists of the ASC contracting out substantially the entire operation of the related anesthesia services that is the subject of the joint venture to the supplier of such services. CRHA would otherwise be a potential competitor to the existing anesthesia provider (that was owed by the ASC and/or its physicians), but in creating these sham arrangements, CRHA receives in return the profits of the business as remuneration for federal program referrals. And in exchange, the ASC and its physician owners receive lump sum payments for selling the referrals.[11]

67. Each joint venture between CRHA and a referring physician/ASC fits squarely within the parameters of the OIG advisory opinion.

68. The referring physicians/ASC expanded into a related line of business— an anesthesia company — which is dependent on referrals from, or business generated by the referring physicians'/ASC's existing business.

69. The referring physicians/ASC contracted out all of the operations of the new business to CRHA, an anesthesia supplier already in that business. CRHA (directly and through related entities as detailed below) agreed to provide not only the management services, but all other necessary services to run the business, such as anesthesia personnel, billing, support, etc.

70. The referring physicians'/ASCs' actual business risk was and is minimal (if any) because the referring physicians/ASCs have a captive patient base and the sole ability to influence

---

[11] Recently, CRHA also has begun to form anesthesia companies from the ground up.

referrals to the new business. CRHA was assured exclusivity through this arrangement when the JV became the exclusive provider of anesthesia services at the ASC.

71. Indeed, absent the joint venture, CRHA would have been a competitor of the referring physicians/ASCs owned and controlled anesthesia company line of business. After the lump-sum payment is made, which CRHA classified as a "purchase," the ASC physicians do not have further involvement or control of the anesthesia company other than the ability to exclusively refer it patients. CRHA and its new entity simply continue to operate and manage the previously ASC physician-owned anesthesia company.

**OIG 2012 Opinion**

72. Consistent with the foregoing, the OIG issued another Advisory Opinion in 2012 (No. 12-06), an opinion on a Requestor's request for guidance regarding *two* proposals by an anesthesia services provider regarding entry into contracts with physician-owned professional corporations or limited liability companies to provide anesthesia services.

73. The Requestor inquired whether the proposed business arrangements constituted grounds for sanctioning under the exclusion authority at section 1128(b)(7) of the Social Security Act (the "Act"), or the Civil Monetary Penalty provision at section 1128A(a)(7) of the Act, as those sections relate to the commission of acts described in section 1128B(b) of the Act, the Federal Anti-Kickback Statute.

74. The first proposal involved double paying physicians for facility fees by way of a per-patient management fee paid to the ASC, even though those fees were not collected from Federal health care program patients. The second proposal involved physician/owners of an ASC establishing an anesthesia management company for the purpose of providing exclusive anesthesia services at the physician's ASC. After analyzing the first proposal under the AKS's regulatory framework (discussed below), the OIG concluded that, even if

federally funded patients were "carved out" of the scheme, the proposed arrangement implicates the AKS because the management fees would be paid to induce referrals.

75. The physician owned ASC would be paid twice for the same services, once from the anesthesia services company and once from the Medicare facility fee.  Further, the OIG concluded that the additional compensation could unduly influence the ASC to use the anesthesia services company as the exclusive provider of anesthesia services, which would be antithetical to the fundamental purpose of the AKS to ensure that physician referrals are based on sound medical judgment and that health care professionals will compete for business based on quality and convenience rather than by paying for referrals.  In sum, the OIG concluded the arrangement implicated the AKS.

76. Similar to the present case, CRHA seeks out gastroenterologists who own both the ASCs and the affiliated anesthesia company.[12]  CRHA pays a lump sum to the physicians not only for an apparent ownership in the anesthesia company but also for exclusive referrals. Relator believes that in order to guarantee these referrals, the physicians agree to return the lump sum if they leave the ASC practice.

77. The second proposal followed the same fate— likely violations of the AKS— for different reasons; to wit, the OIG's long running concern that physician investment in ASCs where the physicians also refer patients may serve to reward referrals rather than reward sound medical judgment.  In fact, when the ASC safe harbor rule was promulgated, OIG stated its main concern was that "a return on investment in an ASC might be a disguised payment for referrals." *See* 64 Fed. Reg. 63,536 (Nov. 19, 1999).

---

[12] Such physician ownership of both the ASC and anesthesia company is arguably a fraudulent scheme by itself as the arrangement allows for the physician ASC owners to directly profit from their referred anesthesia services.

78. In the model under review, the ASC's physician owners established separate companies for the purpose of providing anesthesia-related services to outpatients undergoing surgery at their ASCs. These companies were the sham joint venture agreements identified in the OIG April 2003 guidance.

79. These joint ventures were wholly owned by the physician PCs and LLCs. The joint venture would exclusively furnish and bill for all anesthesia-related services provided at the surgical centers. The sham JV would, in turn, engage the anesthesia service provider (AP) as an independent contractor to provide anesthesia-related services to the ASCs on an exclusive basis thereby meeting the elements and characteristics of the joint venture in the 2003 guidance.

80. In this second proposed arrangement, the ASC would pay a negotiated rate for the services. This is tantamount to what each ASC would pay each joint venture in this case. The fees for the services in the second proposed arrangement would be paid out of the collections made by the joint venture for anesthesia-related services, with the joint venture retaining any profits, exactly as is the case with joint ventures.

81. The OIG noted that no safe harbor would apply because such payment on the profits would be prohibited under the anti-kickback statute if one purpose of that remuneration is to generate or reward referrals for anesthesia services.

82. OIG further opined that this second proposed arrangement poses more than a minimal risk of fraud and abuse. As discussed previously regarding OIG's guidance on joint ventures, the OIG has long-standing concerns about arrangements between those in a position to refer business, such as the ASC's physician-owners here, and those furnishing items or services for which Medicare or Medicaid pays, especially when all or most of the business of the joint venture is derived from one or more of the joint ventures.

83. In fact, the OIG recognized that this arrangement shared several common elements with the suspect joint venture arrangements previously analyzed in the Special Advisory Bulletin on "Contractual Joint Ventures." *See* 68 Fed. Reg. 23,148 (Apr. 30, 2003) (the "Special Advisory Bulletin").

84. Like the Owner in the arrangement described in the April 2003 Special Advisory Bulletin, the ASC's physician-owners would be expanding into a related line of business—anesthesia services—that would be wholly dependent on the ASC's referrals. The ASC's physician-owners would not actually participate in the operation of the joint venture but rather would contract out substantially all of the operations exclusively to the anesthesia services provider. And, like the Owner in the Special Advisory Bulletin in 2003, the ASC's physician-owners' actual business risk would be minimal because they would control the amount of business, they would refer to the joint venture.

85. In the 2012 opinion, the OIG also concluded that these arrangements are designed to permit the ASC's physician-owners to do indirectly what they cannot do directly; that is, to receive compensation, in the form of a portion of anesthesia service revenues, in return for their referrals to the anesthesia services provider.

86. The OIG's conclusion was further supported by the Requestor's claim or market pressure (from the ASCs) to enter into the Proposed Arrangements to compete with other anesthesia groups in the area who engaged in similar schemes, exactly as is the case with CRHA. In other words, the AP in the proposed arrangement must "pay to play" or lose the ASC's business.

87. This case fits squarely within the parameters outlined by the OIG in its 2003 and 2012 guidance. CRHA is that provider of anesthesia services which has entered into sham joint ventures with its referral sources in order to lock in a stream of anesthesia referrals and

disguise the payment of kickbacks to those providers as lump sum payments for purchase of ownership interest in the anesthesia companies in violation of the OIG's guidance, the AKS, and the federal and state False Claims Acts, as further detailed below.

## COMPANY WRONGDOING

88. Relator was contacted by an employee of Anesthesia Associates of the Rockies ("AAR") to inquire about Relator's anesthesia company potentially providing anesthesia services for Rocky Mountain Gastroenterology at its ASC.

89. At that time, AAR was an anesthesia company owned by the gastroenterologists at Rocky Mountain Gastroenterology.

90. AAR was established in 2009 and its then registered agent was Craig Bakken. In 2015, AAR's registered agent changed to Alexander Cmil. Mr. Cmil is the CEO of Rocky Mountain Gastroenterology ("RMG").

91. RMG exclusively used AAR for all anesthesia services provided at RMG's ASC. This self-referral arrangement was in clear violation of the AKS.

92. In June 2017, Central Colorado Anesthesia Associates ("CCAA") was formed as a Colorado LLC. CCAA's principal office was located in Bellevue, WA and CCAA was formed by CRH's Jay Kreger and Richard Bear. Its Bellevue, Washington address was also that of CRHA.

93. Between June 2017 and September 2017, CCAA became the exclusive provider of anesthesia services to RMG.

94. In September 2017, CRHA purported to purchase 51% of CCAA, which is the company CRHA only recently formed in Colorado.

95. CRHA did not directly purchase AAR from RMG or its physician owners in order to disguise the fraudulent lump sum kickbacks. CRHA made the payment to purchase the new

entity it itself formed. The purchase money flowed directly to RMG. CRHA purchased 51% of CCAA for consideration of $7,909,243. This purchase allowed CRHA to obtain exclusive referrals from and at RMG.

96. Cindy Hamilton, former human resource and payroll manager of RMG at the time of these transactions, would have first-hand knowledge of the financial details. She was fired by CRHA in November 2017.

97. Two years later, in September 2019, RMG sold the remaining 49% ownership to CRHA for an additional lump sum payment. This transaction was disguised such that AAR was not actually sold but rather, CRHA purchased the entity it created (CCAA), and the money simply flowed through to RMG and its physicians.

98. According to CRH's SEC filings, "[o]n August 31, 2019, a subsidiary of the Company [CRH] entered into a membership interest purchase agreement to purchase the remaining 49% interest in Central Colorado Anesthesia Associates LLC ("CCAA"); prior to the purchase the Company held a 51% interest in the CCAA entity. The purchase consideration paid via cash, for the acquisition of the remaining 49% interest was $7,000,000 plus 49% of CCAA's working capital as of August 31, 2019. Additionally, the Company incurred deferred acquisition costs of $18,658."[13] The purchase money flowed directly to RMG and its physician owners like the initial payment in 2017.

99. After the initial purchase, CCAA retained all the AAR employees and no operational changes were made.

---

[13] CRH, 10-Q, 9-30-20, P. 17

**The State FCAs**

100.     The fraud in question took place in at least thirteen (13) States.  Medicaid is a jointly funded federal and state program that enables States to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical services.

101.     To the extent Defendants submitted anesthesia claims to Medicaid for services that were induced by kickbacks, those claims are also false under the Colorado, Florida, Georgia, Indiana, Louisiana, Massachusetts, North Carolina, Tennessee, Texas, Virginia, and Washington FCAs which are materially identical to the federal FCA. *See, e.g.*, Georgia Taxpayer Protection False Claims Act**,** codified at 23-3-120 TO 23-3-127 (as amended Ga. L. 2013, p. 141, § 23/HB 79) and State False Medicaid Claims Act, codified at 49-4-168 TO 49-4-168.6 (as amended Ga. L. 2013, p. 141, § 49/HB 79); the Texas Medical Assistance Program, Damages and Penalties**,** codified at Human Resources Code § 32.039 (as amended through Acts 2007, 80th leg., ch. 127) and Medicaid Fraud Prevention (including actions by private persons), codified at Human Resources Code §§ 36.001 *et seq.* (as amended through Acts 2013, 83nd Leg., ch. 1311); North Carolina Taxpayer Protection False Claims Act, codified at N.C.G.S §§1-605 through 617 (as amended by Session Law 2010-96); Florida Taxpayer Protection Claims Act, codified at Statutes, Title VI, Chapter 68, Sections 68.081-68.092; Massachusetts Taxpayer Protection False Claims Act, codified at M.G.L. c. 12, §§ 5A-5O; the Louisiana Taxpayer Protection False Claims Act, codified at La. R.S. 46:438.1 *et seq.* (As amended through Acts 2011, No. 185); Colorado Taxpayer Protection False Claims Act, codified at Section 25.5-4-303.5 to 25.5-4-310; the Tennessee Taxpayer Protection False Claims Act, codified at  TCA § 4-18-101

27

et seq., and Tennessee Medicaid False Claims Act, T.C.A. § 71-5-181 *et seq*.; Indiana False

Claims and Whistleblower Protection Act, codified at 5-11-5.5 *et seq*. (as amended through

P.L. 109-2014); Indiana Medicaid False Claims and Whistleblower Protection Act,

codified at 5-11-5.7 *et seq*. (as amended through P.L. 109-2014); Washington State

Medicaid Fraud False Claims Act, codified at RCW Title 74, *et seq*. (Added by Chapter

241, Laws 2012. Effective date June 7, 2012. Renewed March 31, 2016); and Virginia

Fraud Against Taxpayers Act § 8.01-216.2 (As amended through 2012, chapter 479).

102.     In sum, the Defendants in this case have created a scheme of sham joint ventures
by which they secure anesthesia referrals and pay kickbacks for same to the referrers of
those services, who are also the ASC owners where the surgeries take place.

103.     These arrangements are accompanied by exclusive anesthesia service agreements,
contractual or de facto.

104.     It can be readily inferred under these circumstances that one purpose was to induce
and reward referrals in violation of AKS.  Accordingly, Defendants are liable for
submitting and causing the submission of false claims under the FCA since 2014 and
continuing to this day.

**<u>COUNT ONE</u>**
**<u>Federal False Claims Act-Presentation of False Claim-31 U.S.C. § 3729(a)(1)(A)</u>**

105.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully
set forth herein.

106.     This is a claim for penalties and treble damages under the Federal False Claims
Act.

107.     In performing the acts described above, Defendants, through the acts of their officers, agents, and employees for the purpose of defrauding the Government, knowingly made or caused to be made false or fraudulent claims for payment to Medicare, Medicaid, and other federal government health programs within the meaning of 31 U.S.C. § 3729(a)(1)(A).

108.     As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the Government.

109.     Therefore, the Federal Government has been damaged in an amount to be proven at trial.

110.     Additionally, the Federal Government is entitled to the maximum penalty for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.

## COUNT TWO
## Federal False Claims Act-False Statements-31 U.S.C. § 3729(a)(1)(B)

111.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

112.     In performing the acts described above, Defendants through the acts of their officers, agents, and employees knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid by the Government in violation of 31 U.S.C §3729(a)(1)(B).

113.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damages in an amount to be determined.

114.     Additionally, the Federal Government is entitled to the maximum penalty for each and every false and fraudulent claim paid or approved arising from the Defendants fraudulent conduct as described herein.

**COUNT THREE**
**Federal False Claims Act-Conspiracy to Make False Claims and Statements-31 U.S.C. § 3729(a)(1)(C)**

115.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

116.     In performing the acts described above, Defendants through the acts of their officers, agents, and employees conspired and acted in concert to make, used, or caused to be made or used, false claims and statements to get a false or fraudulent claims paid by the Government in violation of 31 U.S.C §3729(a)(1)(C).

117.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damages in an amount to be determined.

118.     Additionally, the Federal Government is entitled to the maximum penalty for each and every false and fraudulent claim paid or approved arising from the Defendants fraudulent conduct as described herein.

**COUNT FOUR**
**Payment Under Mistake of Fact**

119.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

120.     This is an action to recover monies paid by the United States and the States and Cities under a mistake of fact that was caused by Defendants through the activities described in the Complaint.

121.     The United States and the States and Cities made payments for two (2) supplemental oxygen devices under the erroneous belief that the records, statements, and proposed amount upon which reimbursement was based were true, correct and proper.

122.     The United States and the States' erroneous beliefs were material to the payments made by the States, Cities and Federal Government.

123.     Because of these mistakes of fact, the United States and States and Cities paid moneys for genetic testing that was not properly reimbursable and to which the United States and the States and Cities are entitled.

124.     By reason of these payments, the United States and the States and Cities have suffered damages in an amount to be determined.

## COUNT FIVE
### Unjust Enrichment

125.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

126.   This is an action to recover monies by which Defendants have been unjustly enriched.

127.   Due to Defendants' improper practices, the United States and the States and Cities paid monies by which Defendants have been unjustly enriched.

128.   By reason of their payments, the United States and the States and Cities are entitled to damages in an amount to be determined.

## COUNT SIX
### (Colorado  Medicaid  False Claims Act C.R.S.A. §25.5-4-300.4 *et seq.*)

129.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

130.   This is a claim for penalties and treble damages under the Colorado Medicaid False Claims Act.

31

131.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Colorado State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Colorado State funded programs within the meaning of C.R.S.A §25.5-4-304.11.

132.    As a result, Colorado State monies were lost through payments made in respect of the claims and other costs were sustained by the Colorado State Government.

133.    Therefore, the Colorado State Government has been damaged in an amount to be proven at trial and is entitled to treble damages as permitted by statute.

**COUNT SEVEN**
**Florida False Claims Act-Fla.  Stat. § 68.081 *et seq.*)**

134.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

135.    This is a claim for penalties and treble damages under the Florida False Claims and Reporting Act.

136.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly presented and/or caused to be presented, directly or indirectly, false or fraudulent claims for payment or approval under Medicaid and other Florida State funded programs to officers or employees of the state within the meaning of Fla.  Stat. § 68.082(2)(a).

137.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly made, used, and/or caused to be made or used, directly or indirectly, false records or statements to get false or fraudulent

claims paid or approved under Medicaid and other Florida State funded programs within the meaning of Fla. Stat. § 68.081(2)(b).

138.    As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

139.    Additionally, the Florida State Government is entitled to the maximum penalty for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from its fraudulent conduct as described herein.

## COUNT EIGHT
## Georgia State Medicaid False Claims Act Ga. Code Ann. § 49-4-168 *et seq.*)

140.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

141.    This is a claim for penalties and treble damages under the Georgia State Medicaid False Claims and Reporting Act.

142.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly presented and/or caused to be presented, directly or indirectly, false or fraudulent claims for payment or approval under Medicaid and other Georgia State funded programs to officers or employees of the state within the meaning of Ga. Code Ann. § 49-4-168. l (a)(l),

143.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly made, used, and/or caused to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Florida State funded programs within the meaning of Ga. Code Ann. § 49-4-168. l (a)(2),

144.    As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

145.    Additionally, the Georgia State Government is entitled to the maximum penalty for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from its fraudulent conduct as described herein.

### COUNT NINE
### (Louisiana Medical Assistance Program Integrity Law
### La. Rev. Stat. 46:438.3(A) and (B))

146.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

147.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Louisiana State funded programs within the meaning of La. Rev. Stat. 46:438.3(A).

148.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly engaged in misrepresentations to obtain, or attempt to obtain, payment from medical assistance program funds within the meaning of La. Rev. Stat. 46:438.3(B).

149.    As a result, Louisiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Louisiana State Government.

150.    Therefore, the Louisiana State Government has been damaged in an amount to be proven at trial and is entitled to treble damages as permitted by statute.

151.    Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein. La. Rev. Stat. 46:438.6(A)(2).

### COUNT TEN
### (Massachusetts False Claims  Act- Mass.  Gen. L. Ch.  12, §§ 5 *et seq*.)

152.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

153.    This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

154.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Massachusetts Commonwealth Government, knowingly  made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth within the meaning of Mass. Gen. L.  Ch.  12, §§  5B(2).

155.    As a result, Massachusetts Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Massachusetts Commonwealth Government.

156.    Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proven at trial and is entitled to treble damages as permitted by statute.

157.    Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendant's fraudulent conduct as described herein.

## COUNT ELEVEN
### (North Carolina False Claims Act- N.C.G.S.A.  § 1-605 *et  seq.*)

158.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set

forth herein.

159.     This is a claim for penalties and treble damages under the North Carolina False Claims

Act.

160.     By virtue of the acts described above, Defendants, for the purpose of defrauding the

North Carolina State Government, knowingly presented and/or caused to be presented false

claims for payment or approval under Medicaid and other North Carolina State funded

programs to officers or employees of the state within the meaning of N.C.G.S.A. § 1-606.

161.     As a result, North Carolina State monies were lost through payments made in respect

of the claims and other costs were sustained by the North Carolina State Government.

162.     Therefore, the North Carolina State Government has been damaged in an amount to be

proven at trial and is entitled to treble damages as permitted by statute.

163.     Additionally, the North Carolina State Government is entitled to the maximum penalty

for each and every false claim presented and caused to be presented by Defendants and

arising from its fraudulent conduct as described herein.

## COUNT TWELVE
### Indiana False Claims and Whistleblower Protection Act Code § 5-11-5.5 *et seq.*

164.     Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set

forth herein.

165.     This is a claim for penalties and treble damages under the Indiana False Claims and

Reporting Act.

166.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Indiana State Government, knowingly presented and/or caused to be presented, directly or indirectly, false or fraudulent claims for payment or approval under Medicaid and other Indiana State funded programs to officers or employees of the state within the meaning of Ind. Code § 5-11-5.5-2(b)(1) and (8).

167.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Indiana State Government, knowingly made, used, and/or caused to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Indiana State funded programs within the meaning of  Ind. Code § 5-11-5.5-2(b)(2) and (8).

168.    As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

169.    Additionally, the Indiana State Government is entitled to the maximum penalty for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from its fraudulent conduct as described herein.

### COUNT THIRTEEN
### (Tennessee Medicaid False Claims Act Tenn. Code Ann. § 4-18-101 *et seq.*)

170.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

171.    This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

172.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly presented and/or caused to be presented to the

state claims for payment under the Medicaid program knowing such claims were false or fraudulent within the meaning of Tenn. Code Ann. § 4-18-103(1).

173.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly made, used, and/or caused to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the state knowing such record or statement were false within the meaning of Tenn. Code Ann. § 4-18-103(2).

**COUNT FOURTEEN**
**(Texas Medicaid Fraud Prevention Law Tex. Hum. Res.  Code § 36.002 *et seq*.)**

174.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

175.    This is a claim for restitution, interest, penalties and double damages under the Texas Medicaid Fraud Prevention Law.

176.    By virtue of the acts described above, the Defendants, for the purpose of defrauding the Texas State Government, knowingly or intentionally made, and/or caused to be made, false statements or representations of material facts on applications for contracts, benefits, or payments under the Medicaid program, within the meaning of Tex. Hum. Res. Code § 36.002(l)(A).

177.    By virtue of the acts described above, the Defendants, for the purpose of defrauding the Texas State Government, knowingly or intentionally made, caused to be made, induced, and/or sought to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule,

regulation, or provider agreement pertaining to the Medicaid program, within the meaning of Tex. Hum. Res. Code § 36.002(4)(B).

## COUNT FIFTEEN
### Washington Medicaid Fraud False Claims Act - WA Rev.  Code 74.66.010 *et seq*.)

178.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

179.    This is a claim within the meaning of WA Rev. Code 74.66.020 for penalties and treble damages under the Washington Medicaid Fraud False Claims Act.

180.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Washington Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Washington government entity under Medicaid funded programs within the meaning of WA Rev.  Code 74.66.020.263.

181.    As a result, Washington State monies were lost through payments made in respect of the claims and other costs that were sustained by the Washington State Government.

182.    Therefore, the Washington State Government has been damaged in an amount to be proven at trial and is entitled to treble damages as permitted by statute.

183.    Additionally, the Washington State Government is entitled to the maximum penalty for each and  every  false  or  fraudulent  claim  presented and caused to be presented  by Defendants and arising from their  fraudulent conduct  as described  herein.

## COUNT SIXTEEN
### (Virginia Fraud Against Taxpayers Act Va. Code Ann. § 8.01-216.1 *et seq.*)

184.    Relator re-alleges and incorporates paragraphs 1-104 of this Complaint as if fully set forth herein.

185.    This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

186.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Virginia Commonwealth funded programs to officers or employees of the Commonwealth within the meaning of Va. Code Ann. § 8.01-216.3(A)(l).

187.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth under Medicaid and other Virginia Commonwealth funded programs within the meaning of Va. Code Ann. § 8.0l-216.3(A)(2).

188.    As a result, Virginia Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Virginia Commonwealth Government.

189.    Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proven at trial and is entitled to treble damages as permitted by statute.

190.    Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for the following relief:

A.      Judgment in an amount equal to treble the damages to be proven at trial against Defendants and in favor of the United States and the States of Colorado, Florida, Georgia, Indiana, Louisiana, Massachusetts, North Carolina, Tennessee, Texas, Virginia, and Washington plus the maximum penalty for each violation of 31 U.S.C. § 3729 proven at trial;

B.      Judgment in amount of proven damages at trial for payment in mistake of fact and unjust enrichment;

C.      An award to Relator of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and equivalent provisions in the state statutes set forth above, including the costs and expenses of this action and reasonable attorneys' fees;

D.      An award to Relator for the maximum amount allowed pursuant to 31 U.S.C. § 3730(h), including twice the amount of back pay, interest on the back pay, and compensation for any special damages sustained by him, including litigation costs and reasonable attorney's fees.

E.      All such other, further, and different relief, whether preliminary or permanent, legal, general, or equitable, as the Court deems just and proper.

## JURY DEMAND

Relator hereby demands a trial by Jury in this matter.

Date: March 11, 2021

Respectfully submitted,

*/s/ J. Marc Vezina*

**VEZINA LAW, PLC**
J. MARC VEZINA, P76232
18 S. Broadway
Ste 200
Lake Orion, MI 48362
(248) 558-2700
jmv@vezinalaw.com
LA Bar No. 24683
TX Bar No. 24000141
GA Bar No. 465449

*/s/ Kelli M. Khalaf*

**VEZINA LAW, PLC**
KELLI M. KHALAF, LA Bar No. 23213
18 S. Broadway
Ste 200
Lake Orion, MI 48362
(248) 558-2700
kkhalaf@vezinalaw.com
*Pro hac vice* application to be filed after filing

*/s/ Brian H. Mahany*

**MAHANY LAW**
Brian H. Mahany (WI Bar: 1065623 and
Maine: 003269)
Timothy Granitz (WI Bar: 1088934)
8112 West Bluemound Road, Suite 101
Wauwatosa, WI 53213
(414) 258-2375
Brian@mahanylaw.com
Tgranitz@mahanylaw.com
*Pro hac vice* application to be filed after filing

Attorneys for Plaintiff-Relator Russell Miller